*STATE v. E. F. MOORE.

*False Pretense—Charge.*

1. A statement upon which money is obtained, to come within the meaning of false pretense, must be false within the knowledge of the party making it, calculated and intended to deceive, and which did deceive, the person from whom the money was taken, and upon which such person reasonably relied at the time of the taking.

2. It is not sufficient that such statement was made after the money was obtained.

3. If the prosecutor, knowing his note is in other hands than the payee's, pays him the money due thereon and trusts him to make the application he is not induced to part with it by any false pretense.

Discussion by AVERY, J., of the essential qualities of a false pretense.

---

*MACRAE, J., did not sit.

INDICTMENT for obtaining money by false pretenses from J. T. Ritter, tried at the May Term, 1892, of the Superior Court of CUMBERLAND County, before *Boykin, J.*

John T. Ritter, the prosecutor, testified that he executed a note to defendant in January, 1888, for $500, and afterwards learned that defendant had put it in bank. Witness got a notice from the cashier of the bank that this note, endorsed by E. F. Moore, was due. Witness came to town and went to see defendant about it. Defendant gave witness a blank note to sign, and told witness to go home, and said he would attend to it; that was about the first of April, 1888. It was a blank note, neither names nor amount were in it. Witness has paid defendant about $475 on witness' account in defendant's store; witness don't know what he did with it. Witness gave defendant a note for $500 in January, 1888, to secure him for goods witness was to get from him. Defendant gave witness credit on his books for that note, and charged him up with the goods he got. Witness paid most of it in money near Christmas, 1888; witness sold a lot of rosin and defendant got the proceeds; witness had very little conversation with defendant about it; witness was paying him along as he could, and defendant was giving him credit for it on his books. The day witness paid defendant all but $24.75, witness asked him for the note; told him to get it and witness would give him a new note for the balance, as witness was going into business in Richmond County and wanted to run the balance awhile longer. Defendant said witness need not bother about it then, that he would run it on till witness got started in his new business in Richmond County. In the summer of 1889, witness told defendant witness would be in some day and pay that note; the next week witness told defendant witness would be in soon to pay that note. He said, "very well." The next week witness was in and told defendant he was ready to pay it. He said he would go

and get it, and went out; witness waited till near train time
and could not wait any longer and left. It was between 2
and 3 o'clock when witness went to see defendant, and the
train left about 3 o'clock. Afterwards, in the fall of 1889,.
witness inquired of him again about it. He said witness
need not bother about it, that he would get the note and
they would fix it up; again he went off and did not return;.
witness did not see him again until after he had made an
assignment. He never told witness that the note was not
his, or that he had transferred it; witness made the payment
in the fall of 1888, and by the last of the year had paid it.
all to defendant but the $24.75; witness did not know that
he was not the owner of the note until after the bank failed;.
witness saw the note afterwards, and don't think there are
any credits on it.

*Cross-examined.*—Witness said that he began business with
defendant in 1886, and opened an account with him then, and
gave him a note for $150; thinks it was a bank note. The
condition of the $500 note was supplies to be advanced dur-
ing the year; witness got goods from him from time to time,.
and delivered to him spirits and turpentine and got credit for
it. Witness had a notice from the bank that the note was
due. The $500 note was a printed Peoples Bank note. The
blank note witness signed was to renew the $500 note in bank;
witness supposed the note was in the bank; afterwards he
signed the other blank note; it was about ninety days after
April. The note dated July, 1888, was signed to enable
Moore to renew the $500 note; defendant had possession of it;
defendant went to the bank after it when witness called for
it; witness knew the note was in the bank at the time; wit-
ness never had any business with defendant at the bank, but
did all his business with him at his store; Mr. Robinson was
his bookkeeper. At the end of each month witness was
charged on the books with the interest on the note; witness
told Robinson he (witness) knew the note was in bank;

witness knew this when he was making payments on the note. The train left Fayetteville about 3 o'clock, and it was between 2 and 3 when witness called to see defendant about the note and witness went for it; defendant never told witness the note was not in the bank; he did tell witness that the second note was to renew the note in bank. Witness did not come to him after defendant's failure, but came after he heard of the bank failure. Witness did not tell Duncan McLean or John McDuffie that he knew the note belonged to the bank; witness cannot tell the difference between a note being *in bank* and belonging to the bank. Witness did much more than a $500 business with defendant; it amounted to $2,000 or $3,000, but witness never owed defendant more than $500 at a time, and witness examined his account on defendant's book from time to time, and saw the charges and credits. The note dated July __, 1888, was read in evidence.

*Re-direct.*—The witness understood the credits were to be placed on the note. Witness had had all his transactions with defendant at his store, and signed all the notes there.

John B. Broadfoot testified for the State, that he was assistant cashier or teller of the Peoples Bank; that the bank held the note for $500, signed by Ritter and payable to defendant. It was assigned the bank by defendant on 5th January, 1888. The January note was paid by the renewal note of April; the January note was regularly discounted in the Peoples Bank by defendant. The credits on the April note were interest payments made by defendant, and amount to about $96, and run from July 5, 1888, to November 16, 1890. The bank suspended December 31, 1890.

*Cross-examined.*—Witness said that E. F. Moore, Jr., was clerk of the bank in April, and about that time, 1888. It is the general custom for those parties to whom notes are given to attend to the renewals thereof.

J. T. Ritter, recalled, testified that he has never seen the January note after it was given, nor the April or July note. The notice witness got from the bank was that the $500 note endorsed by Moore was due. It was about April 1, 1888.

The State closed.

The note given in July was as follows:

"$500.                     FAYETTEVILLE, July __, 1888.

Ninety days after date I promise to pay to E. F. Moore, or order, five hundred dollars for value received, negotiable and payable at the Peoples National Bank of Fayetteville, N. C., with interest after maturity at the rate of eight per cent. per annum until paid, for money loaned to renew $500. Due _____, 188___.                JOHN T. RITTER."

Among other prayers for instructions, the following were submitted by the defendant:

1. The bill of indictment charges the obtaining of money by defendant from J. T. Ritter by representing that a certain note for $500, made by J. T. Ritter to E F. Moore was his (Moore's), and that he (Moore) had a right to collect the same. By the testimony of the prosecutor Ritter, it appears that he knew that the said note was the property of the Peoples National Bank, and therefore the State has failed to make out its case, and the jury should find a verdict of not guilty.

2. That it is incumbent upon the State to prove that the defendant Moore stated to the prosecutor that he was the owner of the note and had a right to collect the same, and that the prosecutor made the payment to him on the faith of that statement, and if the State has failed to make such proof, the verdict should be not guilty.

3. That if, upon all the testimony, the jury shall believe that the prosecutor Ritter knew that the $500 note of January, 1888, had been assigned and transferred to the Peoples National Bank by the defendant when the prosecutor made

the payment to the defendant, that the said payments were not made in consequence of any false representations of defendant, and the jury should find a verdict of not guilty.

To the refusal to instruct the jury as requested, the defendant excepted and appealed from the judgment.

*The Attorney General,* for the State.

*Messrs. G. M. Rose, C. M. Cooke* and *W. W. Fuller,* for defendant.

AVERY, J.: It was essential to the successful prosecution of the indictment to show that the prosecuting witness Ritter was induced by a reasonable reliance upon false representations made by the defendant to pay the latter money to be applied to the gradual extinction of his note theretofore executed. The question that confronts us at the threshold of our investigation is whether the testimony of Ritter tended to prove that any false statement was made by Moore in reference to the ownership of the note which was calculated to deceive or did deceive him, and influence him to pay the money to the defendant. As well in civil actions, brought to recover of another for losses incurred by false representations, as in criminal prosecutions founded upon the same species of fraud, the burden is on the actor or prosecutor to show, not only the false representation, but that a reasonable reliance upon its truth induced the plaintiff or prosecutor to part with his money or property, the only difference being as to the *quantum* of proof. *State* v. *Phifer,* 65 N. C., 321; *Walsh* v. *Hall,* 66 N. C., 233. Hence it is that both indictments (relied upon as separate counts of one indictment) charged that the fraud was accomplished and the money paid over to the defendant because of his fraudulent representation that he owned the note, to the discharge of which the prosecutor proposed to have the payments applied. By collating the facts bearing upon the main questions that were elicited both by the direct and

cross-examination of the prosecuting witness, we learn that after purchasing supplies from the defendant for the two previous years, and delivering to him in 1886, on opening an account at his store, a note which he thought was a bank note, Ritter, on the first day of January, 1888, executed the first of a series of notes for $500 which was payable to the defendant. Before the expiration of ninety days from January 1, 1888, the prosecutor states that in consequence of notice from the bank that his note, endorsed by defendant, was due, he came to Fayetteville, saw the defendant Moore about it, and signed a printed Peoples Bank note, in blank, in order to renew that in bank, which he had notice would fall due. Again, in July, 1888, the prosecutor admits that he signed a third note for $500 in order to enable Moore to renew the bank note. The note last mentioned was in evidence, and proved to have been a promise to pay to E. F. Moore, or order, negotiable and payable at The Peoples National Bank at Fayetteville. No payment seems to have been made on any of this series of notes till near Christmas, 1888, when the prosecutor sold a lot of rosin and turpentine, the proceeds of which passed into Moore's hands and were sufficient to pay all of the amount due on the note except the sum of $24.75; but the amount so received was not, in fact, applied by Moore in discharge of said note—no credit having ever been entered upon it. On the same day that the last and largest payment was made, the prosecuting witness, for the first time, asked to see the note. It does not appear that he asked for it before paying the money, and that anything that was said by Moore in reference to his ability to get the note influenced the prosecutor to pay the money. The more natural inference from his testimony is that he asked Moore to get it for him, and take a new note for the balance, after paying all but $24.75 of the sum due. It is possible that the defendant would have gotten the note and settled on the proposed basis had Ritter

111—43

remained long enough at the store; but even if Moore told a falsehood or deceived him after all the money had been paid, the misleading inference that he naturally drew from the defendant's language or conduct, after such payments were made, were not, in contemplation of law, the means by which he was deceived or defrauded. As the prosecutor, neither on his own showing nor by other testimony, proved any false representation made by the defendant, or any misleading conduct before the money was paid, which could have induced him to pay when he would not have done so but for such language or conduct, we think that the Judge should have given the instruction embodied in the three first prayers submitted by the defendant, and which would have amounted practically to telling the jury to return a verdict of not guilty. The defendant knew, at every stage of the transaction, that his note was in bank, and had every reason to believe it was controlled by the bank, except in so far as Moore's personal influence might induce its officers to entrust it to him. According to his own testimony it is manifest that he trusted Moore, without question, to see to the application of the money paid him in liquidation of the note, which he knew was in the bank and subject to the control of its officers. If Ritter was so ignorant of the law and custom among brokers as not to understand what was implied by the repeated invitations to renew ninety-day notes, Moore cannot be held a criminal for failure to enlighten him and fully explain the situation. Ritter testifies that Moore never, at any time, told him that the note was not in bank, but he did tell him that the second note was a renewal of the first note. The third note, the prosecutor must have understood, was substituted for the second note, which he knew was a bank note, and though he signed it at Moore's store, as he had signed the other notes, he says that Moore never, at any time, told him that his note was not in bank.. If, then, there is no testimony tending to show a purpose on Moore's part

to mislead, or that he did deceive Ritter, till after the payments were made, the evidence was totally insufficient to go to the jury in support of the charge that Moore had obtained the prosecutor's money by false representations as to the ownership of the note.

We have not deemed it necessary to discuss or decide the interesting question whether any misrepresentation made by Moore was calculated to deceive, under the rule laid down by this Court, as we have not noticed numerous other points raised by the exceptions.

In refusing the instructions asked, there was error for which a new trial must be awarded.

New Trial.